J-A21043-23
J-A21044-23
J-A21045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ALVIN JONES | : | |
| | : | |
| Appellant | : | No. 1209 EDA 2023 |

Appeal from the PCRA Order Entered January 18, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000709-2012

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ALVIN JONES | : | |
| | : | |
| Appellant | : | No. 1208 EDA 2023 |

Appeal from the PCRA Order Entered January 18, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0004817-2011

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ALVIN JONES | : | |
| | : | |
| Appellant | : | No. 1207 EDA 2023 |

J-A21043-23
J-A21044-23
J-A21045-23

Appeal from the PCRA Order Entered January 18, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000709-2012,
CP-15-CR-0004817-2011

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 07, 2024**

Appellant, James Alvin Jones, appeals *nunc pro tunc* from the post-conviction court's January 18, 2022 order denying his petition for relief filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. Additionally, Appellant's counsel, Scott J. Werner, Jr., Esq., has filed a petition to withdraw from representing Appellant, along with an ***Anders***[1] brief, at each docket number. While a ***Turner/Finley***[2] no-merit letter is the appropriate filing when counsel seeks to withdraw on appeal from the denial of PCRA relief, we will accept Attorney Werner's ***Anders*** brief in lieu of a ***Turner/Finley*** no-merit letter.[3] After careful review, we quash the appeals at docket Nos. 1208 EDA 2023 and 1209 EDA 2023. We affirm the PCRA court's order at docket No. 1207 EDA 2023, and grant Attorney Werner's petition to withdraw.

---

[1] ***Anders v. California***, 386 U.S. 738 (1967).

[2] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988); ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[3] ***See Commonwealth v. Widgins***, 29 A.3d 816, 817 n.2 (Pa. Super. 2011) ("Because an ***Anders*** brief provides greater protection to a defendant, this Court may accept an ***Anders*** brief in lieu of a ***Turner/Finley*** letter.") (citation omitted).

- 2 -

The PCRA court presented a detailed summary of the facts and procedural history underlying Appellant's convictions, which we adopt for purposes of this appeal. **See** PCRA Court Opinion (PCO), 12/21/21, at 1-5. Procedurally, Appellant entered a plea agreement on August 23, 2013, in the case docketed at CP-15-CR-0000709-2012, to two counts of murder in the third-degree and one count of conspiracy.[4] The agreement called for a sentence of 20 to 40 years' incarceration for Appellant's first count of third-degree murder, but the plea agreement left open the sentence he would receive for the second count of that offense, as well as for his conspiracy conviction. Ultimately, on November 6, 2013, the court sentenced Appellant to consecutive terms of 20 to 40 years' imprisonment on each third-degree-murder count, plus 10 years' consecutive probation for the conspiracy offense.

Appellant filed a timely motion for reconsideration of his sentence, which the court granted. The court resentenced Appellant on May 12, 2014, to 14½ to 29 years' imprisonment on his second count of third-degree murder, and left unchanged his sentences on the other two counts. This Court affirmed Appellant's judgment of sentence on direct appeal, and he did not seek review

---

[4] That same day, Appellant also entered a guilty plea to the same charges of third-degree murder and conspiracy in CP-15-CR-0004817-2011. However, on November 6, 2013, the court entered an order stating that those charges were withdrawn pursuant to the plea agreement in CP-15-CR-0000709-2012. **See** Order, 11/6/13. Accordingly, no judgment of sentence exists at docket number CP-15-CR-0004817-2011.

J-A21043-23
J-A21044-23
J-A21045-23

with our Supreme Court. ***See Commonwealth v. Jones***, 158 A.3d 182 (Pa. Super. 2016) (unpublished memorandum).

On October 19, 2017, Appellant filed a timely, counseled PCRA petition, alleging that his plea and appellate counsels were ineffective regarding his plea and sentencing for the second count of third-degree murder.[5] Over the next several years, the Commonwealth and Appellant filed answers and responses, respectively.[6] Ultimately, on December 21, 2021, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss Appellant's petition without a hearing, along with an accompanying opinion. Appellant filed a response, but on January 18, 2022, the court issued an order dismissing his petition. The court's order was filed at both CP-15-CR-0004817-2011 and CP-15-CR-0000709-2012.

On October 7, 2022, Appellant filed a PCRA petition (again, at both docket numbers) seeking reinstatement of his right to appeal from the January 18, 2022 order denying his petition, arguing that his PCRA counsel had

_____

[5] Confusingly, Appellant filed his PCRA petition at both docket numbers CP-15-CR-0004817-2011 and CP-15-CR-0000709-2012, despite that the charges were withdrawn, and no judgment of sentence exists, at CP-15-CR-0004817-2011.

[6] As the PCRA court points out, the Commonwealth and Appellant each filed numerous requests for extensions of time to file these answers and responses, which the court granted. ***See*** PCO at 4. According to the court, "[s]aid requests were granted in the interest of justice and because [Appellant] is not challenging the 20 to 40 year sentence he agreed to on [the first count of third-degree murder], which he is currently serving. Therefore, although there has been a delay in addressing the PCRA action, [Appellant] has not been negatively affected." ***Id.***

- 4 -

abandoned him and had failed to file a requested appeal on his behalf. On April 3, 2023, an "Order Granting Request To Appeal Denial Of PCRA Petition *Nunc Pro Tunc*" was entered at both trial court docket numbers.

On May 2, 2023, Appellant timely filed a *nunc pro tunc* notice of appeal from the January 18, 2022 order, which was docketed at 1207 EDA 2023.[7] The May 2, 2023 notice of appeal listed both trial court docket numbers in the caption. On May 4, 2023, Appellant filed in the trial court an amended notice of appeal (1208 EDA 2023) from the "dismissal of the PCRA entered in this matter on the 18th day of January 2022," listing only CP-15-CR-0004817-2011 in the caption. That same day, Appellant also filed in the trial court an amended notice of appeal (1209 EDA 2023) from the "dismissal of the PCRA entered in this matter on the 18th day of January 2022," listing only CP-15-CR-0000709-2012 in the caption.[8]

At this juncture, we note that in **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), the Pennsylvania Supreme Court held that appellants are

_____

[7] Although Appellant's notice of appeal stated he is appealing from the dismissal of the PCRA petition entered on the April 19, 2022, it is clear that his appeal actually lies from the January 18, 2022 order. Thus, the appeal docket in 1207 EDA 2023 has been corrected to reflect that date.

[8] On January 18, 2024, this Court entered an order consolidating Appellant's three appeals. In that same order, we also took judicial notice of the fact that Appellant's counsel of record, now-Judge Thomas Patrick McCabe, had assumed the bench at the Chester County Court of Common Pleas following the filing of Appellant's appeals. Then-Attorney McCabe had filed petitions to withdraw as counsel in each appeal, which we granted. We remanded for the appointment of new counsel, and Attorney Werner was appointed below.

required to file separate notices of appeal when a single order resolves issues arising on more than one lower court docket. The decision applies to all cases filed after June 1, 2018. However, in **Commonwealth v. Stansbury**, 219 A.3d 157 (Pa. Super. 2019), this Court concluded that a breakdown in the courts occurs when a PCRA court advises petitioners that they can pursue appellate review by filing a single notice of appeal, even though the order disposes of petitions pending at multiple docket numbers. **See also Commonwealth v. Larkin**, 235 A.3d 350, 352-54 (Pa. Super. 2020) (*en banc*) (reaffirming **Stansbury**).[9]

Here, the PCRA court's April 3, 2023 order reinstating Appellant's appeal rights from the January 18, 2022 order listed both trial court docket numbers in the caption and stated, "Defendant shall file **a** Notice of Appeal within thirty days…." Order, 4/3/23, at 1 (emphasis added). Additionally, the PCRA court's January 18, 2022 dismissal order listed both trial court docket numbers in the caption and stated, "Defendant is advised that this is a final Order and he has thirty (30) days in which to appeal." Order, 1/18/22, at 1. Thus, because the court's orders indicated that a singular appeal would suffice, we conclude that there was a breakdown as per **Stansbury** and **Larkin**, and we will allow the

---

[9] The Supreme Court of Pennsylvania also went on to hold, in **Commonwealth v. Young**, 265 A.3d 462, 477 n.19 (Pa. 2021), that quashal is not mandatory where the appellant fails to comply with **Walker**. Instead, as long as the appeal is timely, we may permit the appellant to correct the error. Additionally, following **Walker** and **Young**, Pa.R.A.P. 902 was amended to align with the holdings in those decisions. **See** Pa.R.A.P. 902(a), (b).

timely appeal at docket No. 1207 EDA 2023 to proceed. Given this disposition, we quash Appellant's duplicative, amended appeals at docket Nos. 1208 EDA 2023 and 1209 EDA 2023.

On February 8, 2024, Attorney Werner filed with this Court a petition to withdraw as counsel and an **Anders** Brief, asserting that Appellant has no non-frivolous issues to raise on appeal. Again, as a **Turner/Finley** letter is the appropriate filing when counsel seeks to withdraw from an appeal from the denial of PCRA relief, we will assess Attorney Werner's petition to withdraw and **Anders** brief under the dictates of **Turner/Finley**.

In **Turner**, our Supreme Court "set forth the appropriate procedures for the withdrawal of court-appointed counsel in collateral attacks on criminal convictions[.]" **Turner**, 544 A.2d at 927. The traditional requirements for proper withdrawal of PCRA counsel, originally set forth in **Finley**, were updated by this Court in **Commonwealth v. Friend**, 896 A.2d 607 (Pa. Super. 2006), *abrogated by* **Commonwealth v. Pitts**, 981 A.2d 875 (Pa. 2009),[10] which provides:

> 1) As part of an application to withdraw as counsel, PCRA counsel must attach to the application a "no-merit" letter[;]

---

[10] In **Pitts**, our Supreme Court abrogated **Friend** "[t]o the extent **Friend** stands for the proposition that an appellate court may *sua sponte* review the sufficiency of a no-merit letter when the defendant has not raised such issue." **Pitts**, 981 A.2d at 879. In this case, Attorney Werner filed his petition to withdraw and no-merit letter with this Court and, thus, our Supreme Court's holding in **Pitts** is inapplicable.

2) PCRA counsel must, in the "no-merit" letter, list each claim the petitioner wishes to have reviewed, and detail the nature and extent of counsel's review of the merits of each of those claims[;]

3) PCRA counsel must set forth in the "no-merit" letter an explanation of why the petitioner's issues are meritless[;]

4) PCRA counsel must contemporaneously forward to the petitioner a copy of the application to withdraw, which must include (i) a copy of both the "no-merit" letter, and (ii) a statement advising the PCRA petitioner that, in the event the trial court grants the application of counsel to withdraw, the petitioner has the right to proceed *pro se*, or with the assistance of privately retained counsel;

5) the court must conduct its own independent review of the record in the light of the PCRA petition and the issues set forth therein, as well as of the contents of the petition of PCRA counsel to withdraw; and

6) the court must agree with counsel that the petition is meritless.

***Friend***, 896 A.2d at 615 (footnote omitted).

In this case, Attorney Werner's no-merit letter sets forth each claim that Appellant "wishes to have reviewed, and detail[s] the nature and extent of counsel's review of the merits of each of those claims[.]" ***Id.*** Attorney Werner also includes an explanation as to why each issue is meritless. ***See Anders*** Brief at 11-51. Additionally, in his petition to withdraw, Attorney Werner has sufficiently evidenced the nature and extent of his review, and states that he has forwarded to Appellant a copy of his petition to withdraw and no-merit letter. Attorney Werner has also advised Appellant that he has the right to proceed with this appeal *pro se* or to hire new counsel. Accordingly, we find that Attorney Werner has complied with the first four prongs of the revised test set forth in ***Friend***.

- 8 -

Next, this Court must conduct its own independent review of the record in light of the issues presented in Appellant's PCRA petition. We do so under the following standard of review:

> "In reviewing the propriety of an order granting or denying PCRA relief, an appellate court is limited to ascertaining whether the record supports the determination of the PCRA court and whether the ruling is free of legal error." **Commonwealth v. Johnson**, … 966 A.2d 523, 532 ([Pa.] 2009). We pay great deference to the findings of the PCRA court, "but its legal determinations are subject to our plenary review." **Id.**

**Commonwealth v. Matias**, 63 A.3d 807, 810 (Pa. Super. 2013).

In assessing Appellant's issues, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have examined the well-reasoned opinion, filed on December 21, 2021, by the Honorable Analisa Sondergaard of the Court of Common Pleas of Chester County.[11] We conclude that Judge Sondergaard's comprehensive opinion accurately disposes of the issues presented by Appellant, and demonstrates that his claims are meritless. Accordingly, we adopt Judge Sondergaard's opinion as our own and affirm the order dismissing Appellant's PCRA petition at docket No. 1207 EDA 2023 for the reasons set forth therein. For the reasons stated *supra*, we quash his appeals at docket Nos. 1208 EDA 2023

---

[11] It does not appear that Judge Sondergaard ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. In lieu of a Rule 1925(a) opinion, Judge Sondegaard filed a "Statement of the Court" on May 24, 2023, indicating that she is relying on the rationale set forth in her December 21, 2021 opinion to support her dismissal of Appellant's petition.

- 9 -

J-A21043-23
J-A21044-23
J-A21045-23

and 1209 EDA 2023. Additionally, we grant Attorney Werner's petition to withdraw.

Order affirmed at No. 1207 EDA 2023. Appeals quashed at Nos. 1208 EDA 2023 and 1209 EDA 2023. Petition to withdraw granted.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/7/2024

- 10 -

A 21043-45-23-TCO

COMMONWEALTH OF PENNSYLVANIA     :IN THE COURT OF COMMON PLEAS

:CHESTER COUNTY, PENNSYLVANIA

vs     :CRIMINAL ACTION

JAMES ALVIN JONES     :NOS. 4817-11; 709-12

Erik T. Walschburger, Esquire, Attorney for the Commonwealth.
Jerome M. Brown, Esquire, Attorney for Defendant.

<u>OPINION</u>

The Pennsylvania Superior Court's September 19, 2016 Decision set forth the summary of the facts of this case[1] as follows:

> Defendant's[2] conviction is the consequence of a deadly attack upon rival gang members that occurred on the night of December 3, 2011, during the course of a student-arranged bonfire par[t]y at 1641 Baltimore Pike in New Garden Township, Chester County, PA. Many in attendance at the party were Kennett High School students, and most attendees were not gang members. However, gang activity is rampant in parts of southern Chester County, the principal gangs being the "Surenos" or Sur 13 and its rival, the Vikings, also referred to as the 'Vaqueros' or 'VK', both comprised principally of members of Mexican/Spanish ancestry.
> On that night, Defendant, who was not a Sur 13 gang member, but a close acquaintance and member of a gang known as 'the Bloods', was in the company of several members of Sur 13, who were ultimately charged with third-degree murder and other crimes in this case. During that evening, news of the Vikings attendance at the bonfire party became known to Sur 13 gang members and to Defendant, [sic] and was disseminated to other Sur 13 gang members.
> Emboldened with mindless machismo, Sur 13 gang members conceived a plan to attack the Vikings who were attending the bonfire party. During the evening before the attack, Defendant had a knife in his possession which he displayed to Sur

---

[1] The Superior Court adopted the facts as set forth in the March 10, 2016 Trial Court Opinion.
[2] For consistency within this Opinion, the term "Appellant," which the Superior Court used to describe defendant James Alvin Jones, has been changed to "Defendant."

13 members and passed around. This knife was later identified as the knife used to kill both victims.

Defendant and as many as fifteen gang members and hangers-on drove in two vehicles to 1641 Baltimore Pike. The two groups exited the vehicles and approached the Vikings in two cadres around a house trailer located on the property. Circumstances became immediately chaotic, with many of the party attendees running in fear from the scene. Police believed that three of the five Vikings present locked themselves in vehicles to avoid harm, but the victims, 27-year-old Cuahuctemoc Bedolla and 29-year-old Jose Rodriguez did not reach safety and were attacked and murdered. The victims were attacked by as many as ten Sur 13 gang members.

The Pennsylvania Superior Court's September 19, 2016 Decision set forth the summary of the procedural history of this case[3] as follows:

On August 23, 2013, Defendant entered into a counseled written plea agreement with the Commonwealth in which he pled guilty to two counts of murder in the third degree, 18 Pa.C.S.A. § 2502(c), and one count of criminal conspiracy to commit third degree murder, 18 Pa.C.S.A. § 903.

The written plea agreement provided for a negotiated term of imprisonment of 20 years to 40 years for the murder of Cuahuctemo Bedolla. **See** Count 3 of the information. Under the terms of the plea agreement, Defendant entered an open plea of guilty to murder in the third degree in the death of the second victim Jose Rodriguez, stated in Count 5 of the information, and to Count 1 of the information charging criminal conspiracy. Defendant and the commonwealth agreed that the sentence to be imposed by the sentencing judge in his discretion on Count 5 would be consecutive to the sentence imposed on Count 3.

The trial court deferred sentencing to allow the Commonwealth and the Defendant to submit sentencing memorandums, which were filed on November 4, 2013. On November 6, 2013, the trial court sentenced Defendant as follows: Count 3, 20 to 40 years imprisonment; Count 5, 20 to 40 years imprisonment consecutive to Count 3; and Count 1, 10 years consecutive probation.

Defendant filed a timely motion for reduction of sentence, pursuant to which, on April 22, 2014 following hearing on the motion,

---

[3] The Superior Court adopted the procedural history as set forth in the March 10, 2016 Trial Court Opinion.

2

oral argument and consideration of briefs, the trial court granted Defendant's motion in part, vacated the sentence on Count 5, and ordered Defendant to be presented for resentencing on May 12, 2014. On the latter date, the trial court resentenced Defendant on Count 5 to 14 years, 6 months to 29 years imprisonment consecutive to Count 3. In all other respects, the sentences imposed on November 6, 2013 on Counts 1 and 5 remained unchanged. No direct appeal was taken from the foregoing judgment of sentence.

Thereafter, on June 11, 2015, Defendant filed a pro se PCRA Petition. Counsel was appointed to represent Defendant. An Amended PCRA Petition was filed on October 7, 2015 by PCRA Counsel, seeking reinstatement of his direct appeal rights. On December 9, 2015, the Court granted Defendant's PCRA request and permitted Defendant to file an appeal within thirty days of the date of the Order. Defendant filed a Notice of Appeal on December 21, 2015 and filed a Concise Statement of Errors Complained of on Appeal on January 19, 2016. The Court issued an Opinion on March 10, 2016 and the record was forwarded to the Superior Court on March 16, 2016. On September 19, 2016, the Superior Court affirmed the judgment of sentence.

On October 19, 2017, Defendant filed a Petition for Post Conviction Collateral Relief. The Commonwealth filed an Answer on April 2, 2018. On November 8, 2018, Defendant filed a Reply to the Commonwealth's Answer/Motion to Dismiss. On August 27, 2019, Defendant filed a Supplemental Reply to Commonwealth's Motion to Dismiss. On November 6, 2020, the Commonwealth filed a Supplemental Answer to PCRA. On June 21, 2021, Defendant filed a Response to the Commonwealth's Answer. On August 13, 2021, the Commonwealth filed its Second Supplemental Answer to Defendant's PCRA Petition. On September 9, 2021, the Court received Defendant's letter response.

As the docket will show, between the time Defendant filed his Petition for Post Conviction Collateral Relief on October 19, 2017 and August 13, 2021 when the

3

Commonwealth filed its Second Supplemental Answer, there were numerous unopposed requests for extensions of time to file Answers and Responses. The Commonwealth and Defendant each had seven requests that were granted. Said requests were granted in the interest of justice and because Defendant is not challenging the 20 to 40 year sentence he agreed to on Count 3, which he is currently serving. Therefore, even though there has been a delay in addressing the PCRA action, Defendant has not been negatively affected.

After performing a thorough, independent review of the pleadings, transcripts, Guilty Plea Colloquy Form, and record, this Court finds that there are no genuine issues concerning any material fact, the claims asserted by Defendant for Post-Conviction Collateral Relief do not have any merit, and no purpose would be served by further proceedings. Defendant is not entitled to post-conviction collateral relief and the PCRA action must be dismissed.

Defendant's PCRA Petition alleges that both trial counsel and appellate counsel were ineffective in their representation of him. To obtain post-conviction collateral relief on an ineffective assistance of counsel claim, a defendant must plead and prove by a preponderance of the evidence that the conviction resulted from ineffective assistance of counsel that, under the circumstances, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Commonwealth v. King, 57 A.3d 607, 613 (Pa. 2012), citing 42 Pa.C.S.A. § 9543(a)(2)(ii). "The Pennsylvania test for ineffectiveness is, in substance, the same as the two-part performance-and-prejudice standard set forth by the United States Supreme Court, see Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), although this Court has divided the performance element into two sub-parts

4

dealing with arguable merit and reasonable strategy." King, 57 A.3d at 613.

Consequently, to succeed on an ineffectiveness of counsel claim, a defendant must establish that the underlying legal claim has arguable merit; counsel had no reasonable basis for acting or failing to act; and the defendant suffered prejudice as a result. King, 57 A.3d at 613, citing Commonwealth v. Pierce, 527 A.2d 973, 975-76 (Pa. 1987). To demonstrate prejudice, a defendant "must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" King, 57 A.3d at 613, quoting Strickland, 466 U.S. at 694, 104 S.Ct. at 2068 and citing Commonwealth v. Cox, 983 A.2d 666, 678 (Pa. 2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." King, 57 A.3d at 613, citing Commonwealth v. Ali, 10 A.3d 282, 291 (Pa. 2010). Therefore, we must first examine whether Defendant's underlying claims are supported by the evidence and whether his claims have arguable merit.

## Discussion:

Applying the above, as well as evidence in the entire record, to Defendant's PCRA allegations regarding ineffectiveness of counsel, it is abundantly clear that Defendant's allegations are not supported by the evidence. Defendant argues that trial counsel and appellate counsel were ineffective regarding the imposed sentence. He alleges that trial counsel was ineffective at the sentencing proceeding and appellate counsel was ineffective for failing to address the specific sentencing claims on appeal.

Defendant's overall issue is that he believes trial counsel was ineffective for failing to properly provide mitigating evidence and argument to the Court before sentencing. Specifically, Defendant set forth the following allegations in his PCRA

5

Petition:

1) Trial counsel failed to define the role of Defendant in this case. Defendant alleges that it is unclear what Defendant's planned role was in the crime and counsel should have highlighted this to the Court. Trial counsel's actions were deficient and unreasonable by not defining the role at sentencing, which affected the sentence Defendant received, and prejudiced Defendant.

2) Trial counsel failed to disabuse the Court of the Commonwealth's position that he was a hardened criminal, incapable of rehabilitation, and in need of incapacitation. He alleges that there was sufficient evidence to the contrary that should have been presented to the Court. Examples of such evidence include a March 21, 2012 Evaluation Report, IEP and other reports, and character letters and testimony. Trial counsel was ineffective for failing to present this evidence and Defendant was prejudiced as a result.

3) Trial counsel was ineffective for failing to set forth a Miller/Montgomery argument on behalf of Defendant, and trial counsel's arguments were devoid of any mention of the relationship of mental health issues to the culpability of Defendant.

4) Defendant argues that because he may not have had the mental capacity to commit first degree murder, trial counsel was ineffective in advising Defendant to plead guilty to a maximum sentence for one count of third degree murder. This opened Defendant to the possibility of the same sentence on the second count of murder, where the Commonwealth may not have been able to prove a degree of guilt higher than third degree murder. Trial counsel was ineffective in failing to investigate Defendant's mental state. The advice to plead guilty was driven by

6

the viewpoint that Defendant was going to be found guilty of first degree murder. Defendant was prejudiced by the advice to plead guilty without proper investigation into a defense of mental infirmity.

PCRA counsel noted the following in the PCRA Petition: "Counsel was only retained on October 8, 2017. At the very moment that fee agreement was being signed, Counsel learned that his step-daughter had tragically died. This death has consumed virtually all of counsel's time and attention as he did not work during the week of October 9th, and then only on October 17 did he receive any documents about this case from the family. These documents are incomplete and have not allowed Counsel to do an adequate and full investigation prior to drafting this PCRA Petition. Nonetheless, given the very late date that the family has come to him, there is a need to file the Petition immediately as the last possible date to file appears to be October 19, 2017. Hence, Counsel is filing this petition to toll the limitations under 42 Pa.C.S.A. §9545 and will seek to amend and supplement after."

On November 8, 2018, Defendant filed a Reply to Commonwealth's Answer/Motion to Dismiss in which he explained and refined his issues regarding trial counsel's ineffectiveness as follows:

1) Trial counsel was ineffective for not defining the role of Defendant in the case. Defendant alleges that it is unclear what his planned role was in the incident and given his educational, emotional, and mental health deficits, he was not the leader and did not direct others to attack the victims. He may have been easily influenced by others to do something that he was otherwise not inclined to do. This affected the sentence and counsel was ineffective for failing to pursue this

7

with the Court.

2) Trial counsel "did nothing" to disabuse the Court of the Commonwealth's sentencing position that Defendant was a hardened criminal, incapable of rehabilitation and needing incapacitation until he was 65 years old.

3) The evaluation report written when Defendant was approaching twenty years old revealed that he was functioning in the low average or borderline capacity. Defendant argues that this shows that he could have been easily led and persuaded by others to take action on the night in question.

4) Defendant argues that the Court did not have reliable information at the time of sentencing and therefore, he must be resentenced. He alleges that the sentencing information was stale and inaccurate. He argues that the mental health evaluation was dated November 21, 2018,[4] which is why the Miller v. Alabama argument of the mitigating factor of youth is so important. Defendant attached mental health records from the Chester County Prison to argue that the mental health diagnosis presented at sentencing was inaccurate. Defendant also attached school records from 2011 and 2012 to refute the Commonwealth's position at sentencing that he was unable to be rehabilitated. Defendant argues that the Miller holding should be more broadly construed and should be applicable to Defendant.

5) Defendant alleges that there was evidence to show that his culpability was less than the Court found for sentencing and that this evidence was not presented to

---

[4] Defendant's reference to a November 21, 2018 mental health evaluation is seemingly incorrect. Evidence shows that a mental health evaluation was performed by Dr. Bruce Mapes and was dated November 21, 2008.

8

the Court. Defense counsel's failure to present this evidence and advocate for Defendant at sentencing was ineffective and resulted in prejudice to Defendant.

On August 26, 2019, Defendant filed a Supplemental Reply to Commonwealth's Answer/Motion to Dismiss. Said pleading set forth three character witnesses that were not called to testify on Defendant's behalf at his sentencing.[5] Defendant alleges that without the testimony of the character witnesses, the Court did not have all the evidence it needed to properly sentence Defendant.

On June 21, 2021, Defendant filed a Reply to the Commonwealth's Supplemental Answer in which he further explained his arguments. First, he agrees that the Miller v. Alabama holding does not apply to Defendant since he is not a juvenile lifer, nor was he sentenced to life imprisonment. However, he argues that the underlying rationale and science behind the decision should be applied to Defendant. Since the brain does not fully develop until age 25, young adults can take actions that are rash, impetuous, and unthinking about consequences. Those can be accentuated in a person like Defendant who is learning disabled and a heavy user of controlled substances.

Second, Defendant reiterates that the character witness evidence should have been used at sentencing to show that Defendant could and did function well in a structured environment, even if it was not in an institutional setting. Defendant attached the three letters referenced in the August 26, 2019 pleading as well as letters from Defendant's father, Defendant's step-mother, and Defendant's counselor from 2005.

---

[5] Defendant states that three letters from the character witnesses were attached to the pleading. However, the letters were not attached and filed with the document. This Court notes that seven character letters were attached to Defendant's June 21, 2021 pleading.

9

Third, Defendant argues that the exhibits he attached to his November 8, 2018 pleading should have been argued differently to the Court to show that Defendant was capable of living in society and that the issues he had growing up led to the conduct in this case. He argues that this mitigation evidence, even if it was known to the Court, was not properly utilized by counsel.

The Commonwealth's Second Supplemental Answer to Defendant's PCRA Petition, filed on August 13, 2021, argued in part that Defendant's reliance on the character witness letters in this PCRA had not been properly established. To obtain PCRA relief for failing to call a potential witness, a defendant must establish that the witness existed and was both available and willing to testify, counsel was informed or should have known of the existence of the witness, and the absence of the witness prejudiced him. The Commonwealth argued that there was no claim by Defendant or the witnesses that they were available and prepared to testify at Defendant's sentencing hearing. Nor does Defendant allege that counsel was aware of the existence of the witnesses.

Defendant's September 9, 2021 letter response suggests that the Commonwealth's assertion is incorrect and argues that character witnesses at sentencings do not have to testify in person and can have their positions set forth in letters for the Court to read. He states, "[t]he fact that no witnesses have come forward who said they were ready, willing, and able to testify, does not mean that this would not have been evidence that would have been accepted by the sentencing Court."

Applying the PCRA ineffectiveness standards to the claims above, this Court determines that the underlying legal claims set forth by Defendant lack arguable merit.

Each of Defendant's allegations will be addressed below, starting with Defendant's claim that his role in the murders was not clearly defined for the Court. The thrust of Defendant's argument is that he believes the evidence shows that he was influenced by others to act due to his mental and intellectual state. While he takes direct responsibility for the actual direct killing of victim Bedolla, he questions his role in the death of victim Rodriguez.

Defendant's claim is not supported by the evidence nor do the PCRA pleadings establish the argument beyond speculation. The pleadings contain many hypotheticals of how Defendant may have been influenced by others because he was not a gang member and was in the company of gang members that could have influenced his actions that night. The pleadings point to Defendant's abuse as a child and his mental, cognitive, and intellectual issues to allege how he could have been persuaded by others. Defendant references his low average or borderline capacity to argue that he could have been easily led and persuaded by others. In addition, the pleadings allege that he may have had difficulty controlling his actions, and he may even have been intoxicated that night. However, Defendant's claims are not supported by the evidence.

There is no evidence in the record that Defendant was under the influence, nor were there any claims by Defendant throughout the plea, sentencing hearings, or appeal that he was influenced to act by others. Even during these PCRA proceedings, Defendant failed to submit a witness certification that he was intoxicated or that other gang members led him to commit the murders. Defendant's speculation in the PCRA proceedings do not meet his burden of proof and must be dismissed because counsel cannot be found to be ineffective for failing to set forth speculative arguments not

11

supported by the evidence.

It must also be remembered that the issue of Defendant's role in the crime was thoroughly addressed by Judge Nagle in the post-sentence motion proceedings and on direct appeal. On November 15, 2013, Defendant filed a Motion to Modify and Reduce Sentence and stated, "Petitioner would like to present additional information which was unavailable or otherwise not presented at sentencing which he believes warrants a reduced sentence, including evidence which tends to suggest a reduced culpability in the death of Jose Rodriguez as well as information on Defendant's background and character."

A hearing was held on January 16, 2014 at which Defendant presented forensic biologist Katherine Cross, who testified that more than just Defendant's DNA was found on the knife that killed the two victims. Defendant filed a Brief in Support of a reduction of Sentence on March 26, 2014, and the Commonwealth filed a Response on April 8, 2014. On April 22, 2014, Judge Nagle entered an Order vacating the sentence Defendant received for the death of Mr. Rodriguez. Based on the additional evidence presented Defendant was resentenced on May 12, 2014, to a lesser sentence than he originally received.

In the April 22, 2014 Order and March 10, 2016 Opinion, Judge Nagle determined Defendant's role in the murders as the basis for the sentence, which was affirmed by the Superior Court on September 19, 2016. Judge Nagle stated the following in his March 10, 2016 Opinion:

> The murders were especially barbaric and the victims suffered
> brutal deaths. Rodriquez[6] is reported to have suffered 5 stab

---

[6] It is noted that while Judge Nagle spelled the victim's name as "Rodriquez," the correct spelling is

wounds from 4 stabbing motions, causing gruesome injuries. His blood was found on the blade of the killing knife and his DNA was found on the Defendant's[7] sneakers. Defendant brought the killing knife to the scene of the crimes, and was a primary actor in the deadly assaults, although not the only one. Based on the evidence, it is reasonable to believe that Rodriquez came to Bedolla's aid and was stabbed in the process of trying to help him. Bedolla suffered 7 stab wounds, one of which penetrated into vertebrae. As noted above, the knife was found approximately 8 feet from a pool of Bedolla's blood, giving credence to the police conclusion that it became dislodged from his body before he was taken by a companion from the crime scene. Rodriquez was found dead at the scene, at the end of a blood trail, his body lying a substantial distance from where the knife was recovered. Although the Commonwealth was unable to prove by direct evidence that Defendant inflicted the fatal wounds to Rodriquez, the circumstantial evidence is sufficient to warrant the conclusion that he was immediately and directly complicit in the administration of the fatal knife wounds that resulted in the death of Mr. Rodriquez. The DNA evidence, taken in conjunction with all of the other evidence, was strongly corroborative of the conclusion that the Defendant wielded the knife when Mr. Rodriquez was stabbed. The Commonwealth has likened the difficulty of the investigation of these crimes to the "fog of war" due to the difficulty of proving the individual complicity of the multiple co-conspirators prosecuted for these deaths. Of the multiple defendants prosecuted for the deaths of these two victims, none received a sentence as severe as the one we imposed on the Defendant for these killings, precisely because the Commonwealth's proofs and assessments of individual conspiratorial culpability varied with each defendant, but were greatest when it came to Defendant's culpability.

Therefore, the role Defendant played during the murders was clearly taken into consideration by the Court for sentencing purposes.

Defendant's next PCRA allegation is that sentencing counsel was ineffective for failing to present additional evidence to counter the Commonwealth's position that he was a hardened criminal, incapable of rehabilitation, and in need of incapacitation.

---

"Rodriguez."

[7] For consistency within this Opinion, the term "Appellant," which Judge Nagle used to describe defendant

13

Defendant alleges that prior counsel "did nothing" to disabuse the Court of the Commonwealth's position. This bald allegation is incorrect.

As a matter of fact, sentencing counsel set forth similar arguments as PCRA counsel that Defendant's abuse as a child, his mental health issues, and lack of parental protection and supervision could have played a role in the murder. In Defendant's Memorandum in Aid of Sentencing, filed November 14, 2013, counsel stated, "[t]he evening could have turned out very differently if [Defendant] had any familial stability or alternatives."

To refute the Commonwealth's position that Defendant was a hardened criminal, incapable of rehabilitation, and in need of incapacitation, sentencing counsel set forth the following argument in the Memorandum in Aid of Sentencing:

> James Jones is 21 years old. He was 19 at the time of these events. He has been in Chester County Prison since December 6, 2011.
> James was born in Virginia Beach, Virginia and had what can only be described as a horrific upbringing. From the age of 3 to 8 he was emotionally, physically and sexually abused by his biological mother. At the age of 8 he was taken to live with his father but was summarily rejected by his step-mother and systematically ostracized from his family. It was the opinion of James' case workers that his step-mother would manufacture reasons to get him removed from the home and placed in various juvenile placement facilities. (Please see the Presentence Investigation (PSI) for a detailed accounting of his placements.) While in placement, James would succeed and meet the goal set forth for him, but upon returning home he would be "set up to fail." Sadly, he still dearly loves his step-mother and believes she has his best interests at heart.
> James has never known a stable home life. At this young age he has already lived in Pennsylvania, Ohio, Virginia, Tennessee and Mississippi, for varying durations and with varying degrees of familial/parental protection/supervision. At the time of this incident, his step mother [sic] had kicked him out of his home

James Alvin Jones in the March 10, 2016 Opinion, has been changed to "Defendant."

14

for some imagined infraction and he was homeless. He was living at the home of Co-Defendant Steven Andrew Daddezio. James describes the night of the incident as his finally relenting to Andrew's insistence that they attend the bonfire party, in spite of James [sic] desire to stay "home." Ultimately James "went with the flow" out of a desire to please Andrew. The evening could have turned out very differently if James had any familial stability or alternatives.

James has a number of mental health issues, including Post Traumatic Stress Disorder as a result of the horrific abuse he endured. (Please see PSI for more detailed description). At [sic] time of this incident, he was not being treated for any of them, nor was he taking necessary medication. He has been receiving prescribed medications while in Chester County Prison, to his great benefit.

He has a 0 Prior Record Score. His criminal history consists of a single juvenile adjudication for Simple Assault and Terroristic Threats from 2008 in which he had a knife on school grounds and opened and closed the knife while making verbal threats to another student. No one was harmed.

He is the only person involved in the incident that night who was not in a gang.

James feels a deep sense of remorse for his actions on the night of December 3, 2011. He is ashamed that something he did took these two men away from their families, especially their children, because he certainly knows what it is like to grow up and not have parents to rely on and take care of you.


Further, at the original sentencing hearing, trial counsel argued vigorously for

Defendant by stating the following:

I think the most interesting thing that was said so far today was the quote that Mr. Jones gave. Ms. Cardamone gave you a very, very lush description of the facts. We obviously have entered pleas in this matter. So we don't contest the facts in this case. But the quote she gave you that I thought was – really, really would allow you to see this case through the clearest eyes, I can't believe I did that, that's –that's not something the monster that they are portraying Mr. Jones to be would say.

That monster, of course, could certainly believe that he did that. It would have been his goal and his aim and his joy. And it wasn't that for Mr. Jones. He could not believe he caused the death of Mr. Bedolla, unquestionably. He has said to anyone who would listen, I did that. I killed him. My acts took his life. That's not

up for debate. The sentence he is going to receive for that is commensurate with that action, that affirmative action, I did that. I can't believe it, but I did that.

Ms. Cardamone would have you believe that Mr. Jones is not in the same category because he is more culpable. He certainly is more culpable. He said, I did that. That's why we have agreed to the sentence of 20 to 40 years on Mr. Bedolla. That is, as we will discuss further, far greater than any sentence that his codefendants received.

Ms. Cardamone points out the evidence against Mr. Jones is strong. And it is strong. And a part of the reason why it is so strong is because very early on in the investigation, Mr. Jones told the police, I stabbed Mr. Bedolla. I stabbed him. I caused his death. He did not say that about Mr. Rodriguez.

To my mind, it seems like if you are confessing – the Commonwealth's memorandum called it a self-serving confession. I'm not aware of any kind of confession that is self-serving. It's self-serving to keep your mouth shut. If you are confessing to stabbing one person, you may as well get it all out there.

He never said he stabbed Mr. Rodriguez. He accepted responsibility and the liability for Mr. Rodriguez's death in the context in which all of his codefendants have likewise pled, that they were part of a large group of people who went there with the intent to get into a fight with the Vikings, and Mr. Rodriguez and Mr. Bedolla ended up dead as a result of that action. To my mind, that means that he should be sentenced with respect to Mr. Rodriguez in the same way that his codefendants have been sentenced for fairness.

A number of codefendants entered pleas that were predicated upon cooperation. That may or may not be necessary. We don't have a sentence for those individuals. The ones who have been sentenced already are as follows, the sentences they received.

Christian Eumana, codefendant, received 11 and a half to 22 years on two counts of third degree murder running concurrently and six years probation consecutive for the criminal conspiracy.

Andrew Daddezio received a sentence of eight and a half to 17 years on the two counts of third degree murder and the criminal conspiracy, all running concurrently.

Codefendant Romero received a sentence of nine to 20 years on two counts of third degree murder running concurrently with ten years of consecutive probation on the criminal conspiracy.

And Codefendant Manuel Chavez received a sentence of seven to 18 years on two counts of third degree murder running at the same time.

16

Every other codefendant who has been sentenced thus far has been sentenced concurrently for the two counts of murder. Mr. Jones does not get that benefit. He did not seek that benefit. He knows what he did to Mr. Bedolla. And he has admitted it is worth the sentence the Commonwealth offered, 20 to 40 years, which is the statutory maximum, which Your Honor, of course, is well aware. He understands that. He thinks that's fair.

He also understands that for whatever responsibility he takes in the death of Mr. Rodriguez, that that should have a further penalty imposed. No one thus far has had an additional penalty imposed for the subsequent killing. The codefendants in this case average a sentence of 8.8. [sic] years. That's not taking into consideration the sentences were run at the same time. If we took that into consideration, they would have a sentence per killing of 4.4 years. That's what it has been worth to be part of this conspiracy thus far. And the posture Mr. Jones is in right now before you is as part of that conspiracy that resulted from the death of Mr. Rodriguez.

Ms. Cardamone said he is more culpable. You should treat him differently. You are already. You are – as we stand before you without you having done anything, he is already serving twice as much time as his closest codefendant.

THE COURT: That's by agreement; correct?

MS. COPELAND: It absolutely is. It absolutely is. Mr. Jones accepts that. He accepts that he is serving twice as much time as his closest codefendant for the things that make him different that he admitted to. He stabbed Mr. Bedolla. He did that. He can't believe he did that, but he did. So he understands it should be different.

My question is for the purpose of Mr. Rodriguez where he is in my mind very much the same. Ms. Cardamone said he was part of a group, but he shouldn't be treated like the other members of that group for some reason. I think he should.

Biographically Mr. Jones is 21 years old. He was 19 years old at the time when these incidents took place. There was a lot of talk about his juvenile record, which obviously is not necessarily applicable to Your Honor to take into consideration because they were misdemeanor adjudications and not available to enhance the sentencing guidelines in any way. You certainly can know about them to get a sense of Mr. Jones and who he is.

There is mentioned in some of these documents of cruelty to animals. I have never seen a single foundational document that explains to me what they are referring to. It's a passing reference. I don't know how much weight Your Honor can give that.

Same thing with the poisoning of the family. I don't honestly know where that came from. It could have been an offhanded

17

comment from any person that just managed to find its way into the record. It doesn't form the basis for any previous charge.

I don't think Your Honor can fairly consider those things. They sound terrible, but unless they are authenticated in some way, I don't think Your Honor can consider them truly.

Mr. deBarrena-Sarobe indicated he has been before Your Honor, and that in a case where someone had no chance and had no foundation, that perhaps that is the kind of person for whom a break should be cut. Mr. Jones is that person. He has led up to this point in his 21 years what can only be described as a horrific life. From the age of three to eight, he was abused emotionally, physically and sexually by his biological mother, who is no longer a part of his life and no —no one really knows where she is now.

It occurs to me as I've gone through the defense of cases of people who abuse children, that at the time when that individual is being prosecuted, nothing means more than the impact that that action had on the victim. Here is the victim, Your Honor. This is what that has wrought. And there is an awareness that behavior destroys a person at their core. That is what Mr. James Jones went through. So take that into consideration.

Even when he was removed from the care – care of his biological mother and taken with his father, he was fundamentally rejected by his stepmother and systematically ostracized by the family for the remainder of his life. That is no foundation. That is no kind of a chance to succeed. It occurs to me that some of the quotes that we have seen about cruelty to animals and poisoning family members may have come from this individual.

There is a lengthy report in the PSI that indicated it was the opinion of one of Mr. Jones's previous caretakers in the placement that he would do so well in the placement and come home to be set up to fail by a family who – it was more convenient for him not to be there, and it was extremely easy to make him not be there by saying things or doing things that would make it seem like he needed to be put back into placement. And that happened on a number of occasions to the extreme frustration of his previous caregivers, which is included in the PSI, which Your Honor I know has read.

During his short life, he has lived in Pennsylvania, Ohio, Tennessee, Mississippi, Virginia, Delaware, all for varying durations, all with varying degrees of parental support or even presence. There were times when he was alone with his siblings.

At the time when this incident occurred, he had been completely removed from his home. He had no place to live. He was living with his codefendant, Andrew Daddezio, and it was – it was – my conversations with Mr. Jones tell me that it was Daddezio's idea to go to the party. Mr. Daddezio, as we know, was

18

a member of Sur 13 unlike James Jones. James Jones is the only person in this entire confrontation who was not in a gang. I think James Jones was a little bit at the mercy of Mr. Daddezio, wanting to please him because the roof over his head was predicated upon that situation being so.

As a coping mechanism in his life, he told me he goes with the flow. And the flow that night, unfortunately, went to the party. That doesn't take away his responsibility for participation when he got there, but if he had any kind of home life or stability or alternatives, I don't think he would have gone there.

Ms. Cardamone and Mr. deBarrena-Sarobe say he is beyond saving, that he cannot possibly be rehabilitated. I just think that could not be further from the truth. While they have spent two years living with this case, I spent two years living with this case and with James Jones. I think I've gotten to know him pretty well. And I can tell this Court that the sentence of 20 to 40 years, while it sounds on its face just shocking and horrible, will actually be good for him, and he thinks so as well. It's going to provide a stability in his life that he absolutely has never known. It is going to provide him with mental health treatment and medication.

Mr. deBarrena-Sarobe noted correctly – Your Honor can see in the PSI – he has a number of mental health conditions as a result of what he endured through his life. And during the time of this incident, he was receiving no treatment for them. And he was receiving no medication for them. And I've seen a change in him from when he went into the prison and had access to those things for the first time in his life. It's a night and day conversation. There is your rehabilitation right there.

He always does well in – I mean, has always done well in placements. When he is given rules to follow and someone to make sure that he is accountable to follow them, he does extremely well. And for him to be able to spend 20 years in a controlled environment and to understand and grow and mature in an environment that is so stable, at the end of that period of time he is going to be a different person.

While he has been in Chester County Prison, he has completed his diploma. He wants – I once said, oh, you completed your GED. He said, no, I got my diploma because a diploma is harder. A diploma means more. It's not an equivalency. It's a real diploma. He is extremely proud of that, as I think he should be.

At the earliest points in his schooling and placement, he was working towards various vocational careers, carpentry, that kind of thing he could do with his hands. He is interested in doing that again. And he is interested in trying to make a life for himself using those skills when he ultimately is released.

19

As far as Mr. Jones personally, I know he feels a deep remorse for what happened that night. I can't believe I did that. He knows what he did. And it destroys him, especially the notion of Mr. Rodriguez's son, because he knows what it is like to grow up in a life with – without having your family and particularly your parents there to guard you and to take care of you. And the fact that he caused that to happen to some other child pains him more than I can describe adequately.

So, Your Honor, as in my sentencing memorandum, we're asking for a sentence – a total sentence of 27 and a half to 40 or to 52 years. We're asking Your Honor to sentence him to consecutive probation on the criminal conspiracy count, as you have done every other codefendant. And we're asking for the bottom of the standard range with the sentencing enhancement for deadly weapon used, which Mr. Jones agreed to without hesitation.

He will be 46 years old at that time. He will be more than a grown man at that time. He will have had time to grow and mature and live. And there is still enough time at that point for him to have a family, for him to have a life. He is not just winding down, you know, his golden years at that point. He could very much live and have a meaningful and positive impact. I know he wants to. I know he is able to. It's just a question of whether or not Your Honor will give him leave to do so.

Mr. Jones has also written a note for Your Honor. He is extremely nervous at the idea of addressing you. I want to check with him and see if he is interested in doing that, but in any case, he did write a letter to give you some idea of what is going on in his mind. A coy of that has been provided to the Commonwealth.

He also does have his mom-mom and pop-pop present in the courtroom to support him. And I know that means a great deal to him. So if Your Honor would allow me –

THE COURT: I have the letter.

MS. COPELAND: Oh, sorry. Thank you. Yes, Your Honor.

THE COURT: I read the letter.

THE DEFENDANT: I would like to say that I apologize for bringing hurt to the families, both the families, because I know how it feels to have someone missing out of my life, and I would like to ask them to forgive me. Spending two years in Chester County, it wasn't a lot of time, but I had enough time to think about what I did. And it does hurt me that two lives was tooken (sic). And I'm worry for it. I'm sorry for my actions. I would like them to forgive me.

(N.T., 11/6/13, pgs. 40-54).

Accordingly, Defendant's PCRA claim that sentencing counsel was ineffective for

20

failing to refute the Commonwealth's position that Defendant was a hardened criminal, incapable of rehabilitation, and in need of incapacitation is without merit. Defendant's argument that sentencing counsel should have presented additional evidence to the Court to support his position, such as the documents he attached to his Reply to Commonwealth's Answer/Motion to Dismiss, filed November 8, 2018, is found to be without consequence. A review of the record shows that Judge Nagle was presented with the same or similar documents prior to sentencing. There was a forty-eight-page Pre-Sentence Report, including supporting documents and evaluations, that detailed Defendant's life, childhood abuse, family and social history, education, mental health, and drug and alcohol abuse history. At sentencing Judge Nagle stated, "I did read from page to page and cover to cover the presentence investigative report that was prepared by the probation department." (N.T., 11/6/13, p. 10). The documents PCRA counsel attached as exhibits were additional supporting documents of the information Judge Nagle already had in his possession, and sentencing counsel was not ineffective for not providing cumulative documentation.

Defendant's claim that counsel was ineffective for not arguing this evidence differently to the Court is also without merit. Even if there was a different approach sentencing counsel could have taken using this evidence, it does not mean that counsel was ineffective. Viewing the totality of the circumstances, including PCRA counsel's current arguments regarding the evidence, this Court deems sentencing counsel was effective, and the Court had the evidence available to make a well-informed sentencing decision.

Defendant's next PCRA argument is that the Court did not have reliable

21

information at the time of sentencing since it was stale and inaccurate. He presented mental health records from the Chester County Prison to argue that the mental health diagnosis presented at sentencing was inaccurate. We disagree.

The history in this case shows that the murders occurred on December 3, 2011. Defendant entered his guilty plea on August 23, 2013. The pre-sentence investigation was completed, and a report was issued on October 31, 2013. Defendant was sentenced six days later on November 6, 2013 and re-sentenced on May 12, 2014. It must be remembered that Defendant participated in the pre-sentence investigation process and provided the investigator with a detailed background information about his life. There were also a multitude of records attached to the report to give the Court an extensive picture of Defendant's life. While some of the attached records were as old as 2008, including the psychological assessment performed by Dr. Bruce E. Mapes, the report also included information about Defendant up to the date of the murders. The information was compiled between the date of the guilty plea on August 23, 2013 and the date of the report, October 31, 2013. Defendant was sentenced six days later. It certainly was not stale. The records and reports that were attached to the report provided a full picture of Defendant's life leading up to the sentencing. The report also noted Defendant's then current mental health assessment as set forth by Chester County Prison.

Defendant attached to his November 8, 2018 pleading reports from the Rockford Center dated in 2002 and 2004 in an attempt to discredit the more recent reports that were attached to the pre-sentence investigation report. This is not logical. Nor is it logical for Defendant to use Chester County Prison mental health assessment sheets

22

from 2013 in an attempt to discredit prior mental health assessments. Defendant fails to set forth an expert report to argue that the prior reports and assessments were incorrect. He makes the allegations without any proof and argues that sentencing counsel was ineffective for failing to make the same speculative arguments.

An individual's mental state may be continually developing and changing through the years. There is no dispute that at the time of the murders Defendant was not being treated for his mental health issues. After his arrest and confinement in Chester County Prison, he began mental health treatment and was prescribed medication. Judge Nagle was fully aware of this information at the time of sentencing and Defendant's PCRA claim is found to be without merit.

Defendant's next PCRA argument is that sentencing counsel was ineffective for failing to set forth a Miller/Montgomery argument on behalf of Defendant. In 2012, the United States Supreme Court decided Miller v. Alabama and held that mandatory life imprisonment without parole for those under the age of eighteen at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments. 567 U.S. 460, 479, 132 S.Ct. 2455, 2469 (2012). In 2016, the United States Supreme Court decided Montgomery v. Louisiana, and held that decision in Miller v. Alabama, announced a new substantive constitutional rule that was retroactive on state collateral review. 577 U.S. 190, 212, 136 S.Ct. 718, 736 (2016).

First, it must be noted that Montgomery v. Louisiana was decided after Defendant was sentenced on November 6, 2013 and re-sentenced on May 12, 2014. Sentencing counsel cannot be held ineffective for failing to argue about a case that had not been decided. Second, the Miller and Montgomery decisions both involved

23

defendants who were under the age of eighteen at the time of their crimes. There is no dispute that Defendant was nineteen years old at the time of the murders. Therefore, Miller and Montgomery are not applicable to the case at hand.

In Defendant's June 21, 2021 Reply to the Commonwealth's Supplemental Answer, he agrees that the Miller v. Alabama holding does not apply to Defendant since he is not a juvenile lifer, nor was he sentenced to life imprisonment. However, he argues that the underlying rationale and science behind the decision should be applied to Defendant. He argues that since the brain does not fully develop until age 25, young adults can take actions that are rash, impetuous, and unthinking about consequences. He believes that those actions can be accentuated in a person like Defendant who is learning-disabled and heavily used controlled substances.

The United States Supreme Court examined the rationale and science behind its decision to limit the holding to defendants under the age of eighteen at the time they committed their crimes. The Miller holding has been examined by numerous Courts since 2012 and has not been extended to defendants over the age of eighteen at the time of their crimes. For example, the defendant in Commonwealth v. Lee used similar arguments in an attempt to have the rational and science behind the Miller case extended to her case. Commonwealth v. Lee, 206 A.3d 1, 8 (Pa.Super. 2019). Even though Lee was over the age of eighteen at the time she committed her crimes, she asked the Superior Court to expand the holding in Miller to apply to her by alleging "characteristics of youth" that rendered her categorically less culpable. Id. Lee cited to "immature brain" studies to argue that her brain was underdeveloped at the time of her crime, and therefore, she could not form the requisite intent for second-degree murder.

24

Id. at 9. Lee argued that the Miller rationale should be applied to her case to provide an exception to the PCRA time-bar. Id.

While the Lee Court's focus was on the PCRA time-bar exception, which is not applicable to the case at hand, the rationale the Superior Court applied to the above arguments is instructive. The Lee Court stated, "There is no question the scientific studies and principles underlying Miller informed its holding. Our Supreme Court, in Batts II,[8] reviewed Miller, Roper[9] and Graham,[10] and discussed those principles at length. The express age limit, however, though arguably not critical to the Miller holding, is, in our opinion, essential to an orderly and practical application of the law. Conceptually, there may not be any statistically significant difference between the mental maturity of a 17-year-old and an 18-year-old, or an 18-year-old and a 19-year-old, and so the question becomes, where do we draw the line?" Lee, 206 A.3d at 9.

Quoting the United States Supreme Court, the Lee Court stated, "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. However, a line must be drawn.... The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." 206 A.3d at 9-10, quoting Roper v. Simmons, 543 U.S. at 574, 125 S.Ct. 1183.

---

[8] 163 A.3d 410 (Pa. 2017).
[9] 543 U.S. 551, 125 S.Ct. 1183 (2005).
[10] 560 U.S. 48, 130 S.Ct. 2011 (2010).

25

Defendant's PCRA argument similarly asserts that the science and rationale behind Miller should be applied in this case. This Court will not extend the Miller science and rationale to young adults over the age of eighteen. It is clear that the Appellate Courts and the United States Supreme Court purposely set forth the age limit for this argument, and this Court will not extend the ruling. Sentencing counsel cannot be found to be ineffective for failing to set forth arguments beyond the current status of the law. It must also be noted that Judge Nagle was well aware of Defendant's age at the time of the murders and Defendant's mental, intellectual, and cognitive state at the time of sentencing. Judge Nagle was certainly aware of the Miller line of cases that included the science of brain development in young adults. Therefore, all of this information would have been considered by Judge Nagle at the time of sentencing. Therefore, Defendant's PCRA arguments are found to be without merit and must be denied.

Defendant's next PCRA argument is that trial counsel was ineffective in advising Defendant to plead guilty to a maximum sentence for one count of third degree murder as this opened Defendant to the possibility of the same sentence on the second count of murder, which the Commonwealth may not have been able to prove due to Defendant's mental state. This appears to be a challenge to the plea and negotiated sentence Defendant that entered on the count of third degree murder of victim Cuahuctemo Bedolla, with the negotiated sentence of twenty to forty years imprisonment, and subsequently a challenge to the open guilty plea on the count of third degree murder of victim Jose Rodriguez. Defendant appears to have abandoned this issue and argument in his subsequent PCRA pleadings; however, in the duty of

26

thoroughness, this Court shall address it.

The March 7, 2012 Amended Information charged Defendant with the following crimes:

- criminal conspiracy, in violation of 18 Pa.C.S.A. § 903(a)(1), (2), (c);

- murder of the first degree of victim Cuahuctemoc Bedolla, in violation of 18 Pa.C.S.A. § 2502(a);

- murder of the third degree of victim Cuahuctemoc Bedolla, in violation of 18 Pa.C.S.A. § 2502(c);

- voluntary manslaughter of victim Cuahuctemoc Bedolla, in violation of 18 Pa.C.S.A. § 2503(a)(1), (2);

- murder of the third degree of victim Jose Rodriguez, in violation of 18 Pa.C.S.A. § 2502(c);

- two counts of involuntary manslaughter of victim(s) Cuahuctemoc Bedolla and/or Jose Rodriguez, in violation of 18 Pa.C.S.A. § 2504(a);

- two counts of aggravated assault of victim(s) Cuahuctemoc Bedolla and/or Jose Rodriguez, in violation of 18 Pa.C.S.A. § 2702(a)(1), (4);

- two counts of simple assault of victim(s) Cuahuctemoc Bedolla and/or Jose Rodriguez, in violation of 18 Pa.C.S.A. § 2701(a)(1);

- two counts of recklessly endangering another person of victim(s) Cuahuctemoc Bedolla and/or Jose Rodriguez, in violation of 18 Pa.C.S.A. § 2705;

- riot, in violation of 18 Pa.C.S.A. § 5501; and

- possessing instruments of crimes, in violation of 18 Pa.C.S.A. § 907(a) and (b).

As discussed above, Defendant pled guilty to one count of third degree murder of

27

victim Cuahuctemoc Bedolla, one count of third degree murder of victim Jose Rodriguez, and one count of criminal conspiracy to commit third degree murder. He admitted to the facts in support the plea and was sentenced pursuant to a negotiated plea agreement on the third degree murder of victim Cuahuctemoc Bedolla. He entered an open guilty plea to third degree murder of victim Jose Rodriguez and conspiracy and was sentenced by the Court.

Specifically, the Guilty Plea Colloquy Form executed by Defendant states that he admitted that the following facts did occur:

> On the evening of December 3, 2011, defendant James Jones conspired with multiple individuals, including his eleven (11) other codefendants, most of whom were members of Surenos 13, to attack members of a rival gang, the Vikings, who were attending a party occurring at 1641 Baltimore Pike, New Garden Township, Chester County, Pennsylvania. He and his codefendants traveled to 1641 Baltimore Pike with the intention of attacking any member of the Vikings found at this location. The defendant and his codefendants agreed to engage in this attack prior to their collective arrival at that address. Furthermore, prior to their arrival, the defendant knew that some of his codefendants were armed with weapons, including knives, sticks and poles. Many of the weapons were in plain view of all of the codefendants. The defendant himself was armed with a large knife.
>
> The defendant and his codefendants went to 1641 Baltimore Pike in two separate cars. When everyone arrived, the defendant and his codefendants got out of the vehicles and split into two groups. Each group went around a different side of the trailer as part of a coordinated, armed attack. James Jones was part of one of these groups that came around the trailer. With wanton and willful disregard to the risk that his conduct would cause death or serious bodily, the defendant and his codefendants overwhelmed and physically attacked two people, Cuahuctemo Bedolla and Jose Rodriguez. During this assault, Bedolla and Rodriguez were stabbed multiple times. Both Bedolla and Rodriguez died as a result of these stab wounds and as a result of this assault.
>
> Mr. Jones was directly and actively involved in this physical assault. Indeed, by his own admission, Mr. Jones stabbed Cuahuctemo Bedolla at least three times. Blood from Mr.

28

Rodriguez was found on the blade of Mr. Jones's knife and on a sneaker he was wearing.

Mr. Jones acknowledges his direct responsibility for the death of Cuahuctemo Bedolla and acknowledges his responsibility for the death of Jose Rodriguez as an accomplice and co-conspirator.

At the August 23, 2013 plea hearing, the attorney for the Commonwealth stated as follows:

MS. CARDAMONE: The fact [sic] of the pleas are as follows: On the evening of December 3rd, 2011 James Jones conspired with multiple individuals including eleven other co-defendants most of whom were Serrano 13 attack [sic] members of a rival gang, the Vikings, which were attending a party at 1641 Baltimore Pike, New Garden in Chester County.

The defendant and his co-defendant traveled to 1641 Baltimore Pike with the intent of attacking any member of the Vikings found at this location. The defendant and his co-defendant agreed to engage in this and talked prior to their arrival at that address, prior to the arrival, knew that some of his co-defendants were armed with weapons, knives, sticks and poles. Many of the weapons were in plain view of all of the co-defendants. This defendant himself was carrying a large knife when he went to the scene of this assault.

The defendant and his co-defendant went to 1641 Baltimore Pike in two separate cars. When everyone arrived the defendant and co-defendant got out of the vehicle and split this [sic] into two groups. Each group went around the side of the trailer as part of the coordinated attack [sic] James Jones was part or the one of these groups that came around the trailer with wanton and willful disregard and that risk would cause death or serious bodily injuries.

The defendant and co-defendant overwhelmed and physically attacked two people, Cuahuatemo Bedolla and Jose Rodriguez. During this assault, Mr. Bedolla and Mr. Rodriguez were stabbed multiple times. Both Mr. Bedolla and Mr. Rodriguez died as a result of multiple stab wounds as a result of this assault. Mr. Jones was directly and actively involved in this physical assault, by his own admission, Mr. Jones stabbed Cuahuatemo Bedolla at least three times.

Moreover, blood from Mr. Rodriguez, the victim, was found on the blade of the knife carried by Mr. Jones as well as on a sneaker that Mr. Jones was wearing. Mr. Jones acknowledges his direct responsibility for the death of Cuahuatemo Bedolla and acknowledges his responsibility for the death of Jose Rodriguez as

29

an accomplice and co-conspirator. They are the facts in support of this plea, Your Honor.

(N.T., 8/23/13, pgs. 5-7).

After Defendant was sworn in to testify, the following exchange took place between the Court and Defendant:

THE COURT: State your name and age.
MR. JONES: James Jones, twenty-one.
THE COURT: Mr. Jones, I know you are incarcerated and have been for some time. Do you take any prescribed medication for any conditions you might have?
MR. JONES: Yes.
THE COURT: What is that medication?
MR. JONES: Seroquel and Lexapro.
THE COURT: And are you on those medications now?
MR. JONES: Yes.
THE COURT: Do those medication (sic) interfere with your ability to think and understand what you are doing today?
MR. JONES: No, sir.
THE COURT: Do they affect you in any way your ability to communicate with your attorney?
MR. JONES: No, sir.
THE COURT: Do they affect you in any way your ability to listen to the D.A.'s statement that she has made thus far and understand what she has said?
MR. JONES: No, sir.
THE COURT: I've been told that you are entering pleas to three charges today. Those charges are murder in the third agree (sic) with respect to Jose Rodriguez, the victim. And the second plea is murder in the third degree with respect to Temo Bedolla. And finally, criminal conspiracy to commit those crimes. Is that what you're doing here today?
MR. JONES: Yes, sir.
THE COURT: Did you hear the facts that the D.A. just placed on the record with respect to the charges against you?
MR. JONES: Yes, sir.
THE COURT: Do you agree that those facts are correctly and truly stated?
MR. JONES: Yes, sir.
THE COURT: And those are the facts that form the basis of your pleas of guilty here today, is that correct?
MR. JONES: Yes, sir.

30

THE COURT: Do you believe you have had sufficient time to discuss your case and meet with your attorney, and I know you've probably done that on a number of occasions, to discuss your case including the facts of this case, the law of the Commonwealth that applies to the facts of this case, and any possible defenses you might have to these crimes?

MR. JONES: Yes, sir.

THE COURT: Are you satisfied with her advice and services to you and her counsel to you in these cases?

MR. JONES: Yes, sir.

THE COURT: Now I've been handed a form called a guilty plea colloquy. And the form has been completed and part of that form contains your signatures, true?

MR. JONES: Yes, sir.

THE COURT: Are these your signatures I see throughout the document?

MR. JONES: Yes, sir.

THE COURT: Are your initials that I see next to the various paragraphs in this document?

MR. JONES: Yes, sir.

THE COURT: There is attached to the guilty plea colloquy a one and a half page recitation of facts of the case of – I think I read it but I think it's identical to what Miss Cardamone, the D.A. just placed on the record. That was there when you signed that document?

MR. JONES: Yes, sir.

THE COURT: Have you had enough opportunity, enough time, as much time as you needed to review and discuss this guilty plea colloquy and its contents with your attorney?

MR. JONES: Yes, sir.

THE COURT: Did you read the document yourself?

MR. JONES: Yes, sir.

THE COURT: and did you also thoroughly review it paragraph by paragraph with your attorney?

MR. JONES: Yes, sir.

THE COURT: And again, you are satisfied with your attorney's advice and services to you and her legal representation of you in this case, is that true?

MR. JONES: Yes, sir.

THE COURT: The guilty plea colloquy, I just want to go over for a minute with you, sets forth, basically, some information about you, states that you are entering voluntary pleas to these charges, sets forth your trial rights, your sentencing rights, your postsentence rights, and verifies that you have reviewed all of those things carefully with your attorney, is that correct?

MR. JONES: Yes, sir.

31

THE COURT: I think you need to sign the document.

MS. COPELAND: I apologize. I realized as you were discussing with my client that was true.

THE COURT: Thank you, counsel. It's now signed, the colloquy. Mr. Jones, you do understand that you would have a right to contest these charges and the right to proceed to a trial with the jury of twelve citizens of Chester County? And if you elected to proceed to trial the Commonwealth would be required to present sufficient evidence to the jury in order to convince the jury that you committed these crimes beyond a reasonable doubt. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: And do you understand that all twelve jurors would have to agree that you are guilty of those offenses? In other words, before you could be convicted the jury and each member of the jury would have to unanimously agree that you are guilty. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: And you also understand that you would have the right to participate in the selection of the jury together with your attorney and the attorney or attorneys for the Commonwealth. And you would have the right, if you wished, to present evidence but you wouldn't have to. And the fact that you do not present any evidence could not be considered by the jury and held against you. Do you understand all of that? Is that true?

MR. JONES: Yes, sir.

THE COURT: Are you freely and voluntarily waiving your rights, giving up your right to go to trial?

MR. JONES: Yes, sir.

THE COURT: No one has forced you to make this decision, have they?

MR. JONES: No, sir.

THE COURT: That decision that you, yourself – all though I know you've had the advice of your attorney, that is a decision that you, yourself must make and you made that decision, is that correct?

MR. JONES: Yes, sir.

THE COURT: You also understand that when a person is charged with criminal offenses that they are presumed to be innocent until proven guilty beyond a reasonable doubt, that they committed those offenses and the same applies here. You are presumed to be innocent until you accept responsibility by pleading guilty. And a plea of guilty has the same consequence as a conviction by a jury. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: Are you freely and voluntarily giving up your presumption of innocence and pleading guilty to these offenses?

MR. JONES: Yes, sir.

THE COURT: No one forced you to do that either, have they?

MR. JONES: No, sir.

THE COURT: Pretrial motion in this case, were there any filed?

MS. COPELAND: We did not file any, no.

THE COURT: The rules of criminal procedure provide, Mr. Jones, that you and your attorney both can, on your behalf, file motions in advance of the trial to try and/or to make an allegation that somehow the evidence was gotten by the police in violation of your rights or that a statement you gave to the police was secured in violation of your rights. And those motions can be filed. And I'm giving you a couple examples. Those motions can be filed before trial. When you plead guilty you give up the right forever to file any such motions. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: And I hear none have been filed in this case. If any had been filed they would be abandoned by your plea of guilty. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: Now I'm told in this case that pursuant to the terms of the plea agreement there is an agreement that you will spend twenty to forty years of incarceration in prison as a result of the third degree murder of Mr. Bedolla. Is that your understanding as well?

MR. JONES: Yes, sir.

THE COURT: I'm also told that in pleading guilty to the murder of Mr. Rodriguez the penalty is to be left to this Court as well as the penalty, if any, for the criminal conspiracy. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: Do you understand, Mr. Jones, I'm sure your lawyer has gone over this with you, the trial judge has the power to impose consecutive sentences. Do you know what I mean by that?

MR. JONES: Yes, sir.

THE COURT: So that I can sentence you to an additional term in prison for the murder of Mr. Rodriguez in addition to the twenty to forty years that you have agreed to for the murder of Mr. Bedolla, is that correct?

MR. JONES: Yes.

THE COURT: Do you understand that?

MR. JONES: Yes, sir.

THE COURT: And the same rule applies to the criminal conspiracy. I can sentence you to a consecutive term for criminal conspiracy as well. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: Or I can sentence you to concurrent sentences, do you understand these as well?

MR. JONES: Yes, sir.

MS. COPELAND: If I could interject briefly so Mr. Jones is aware, it's part of our agreement with the Commonwealth, at least with respect to Mr. Rodriguez, he has been advised that the sentence will be consecutive to Mr. Bedolla. There is no ambiguity there.

THE COURT: You did tell me that. Excuse me. That is true. So there is a request that I sentence you to a consecutive sentence of something for the second murder. Do you understand that?

MR. JONES: Yes, sir.

THE COURT: Have you signed the guilty plea colloquy form of your own free will, no one forced you to do that?

MR. JONES: Yes, sir.

THE COURT: Are you currently on probation or parole for any other offenses?

MR. JONES: No, sir.

THE COURT: Do you have any questions that you wish to ask me?

MR. JONES: No, sir.

THE COURT: Counsel, do you have any additional questions that you wish to have me ask your client?

MS. COPELAND: Your Honor, I feel you colloquized him very thoroughly. I have nothing else that I would have you ask him. I'm not sure if this is the moment to ask for a PSI but that would be the only thing I would add.

THE COURT: I was going to get to that. Ms. Cardamone, is there anything you wish me to further ask Mr. Jones?

MS. CARDAMONE: No, Your Honor.

THE COURT: Very well. Mr. James Jones, you're charged with two informations, with the murder in the third degree of Jose Rodriguez. How do you plead, guilty or not guilty?

MR. JONES: Guilty.

THE COURT: You're charged in the information with the murder in the third degree of Temo Bedolla. How do you plead, guilty or not guilty?

MR. JONES: Guilty.

THE COURT: I accept your pleas. I find that they are knowingly, intelligently and voluntarily given. I watched carefully

34

your demeanor during the course of the colloquy and I do believe
that your pleas are knowing and voluntary in this case.

(N.T., 8/23/13, pgs. 7-19).

In exchange for entering guilty pleas to three counts, the remaining twelve counts were withdrawn by the Commonwealth. Defendant's allegation that counsel was ineffective for advising Defendant to plead guilty to third degree murder with a twenty to forty year negotiated sentence because it opened Defendant to the possibility of the same sentence on the other count of third degree murder is without merit. It was perfectly clear that Defendant decided to take his chance with the sentence the Court may impose after an open plea. Defendant was aware of the maximum sentence of forty years to that charge, as that is the sentence he agreed to on the same charge.

Defense counsel vigorously argued at sentencing that his sentence on the second third degree murder charge should be in line with the sentences his co-defendants received. These arguments were directly related to the culpability of each of the co-defendants and the role they played in the crimes. The Court's rejection of defense counsel's argument because it found Defendant to be the most culpable among all the co-defendants does not mean counsel was ineffective, nor does it make counsel's advice to enter the plea ineffective.

If Defendant went to trial and was convicted of the first degree murder charge, he would have received life imprisonment, pursuant to 42 Pa.C.S.A. § 9711(a). If Defendant was found guilty of conspiracy to commit murder of the third degree, he was facing a maximum sentence of forty years imprisonment, pursuant to 18 Pa.C.S.A. § 1102(d) and 18 Pa.C.S.A. § 905(a). If Defendant was found guilty of murder of the third degree of victim Cuahuctemoc Bedolla, he was facing a maximum sentence of forty

years imprisonment, pursuant to 18 Pa.C.S.A. § 1102(d). If Defendant was found guilty of murder of the third degree of victim Jose Rodriguez, he was facing a maximum sentence of forty years imprisonment, pursuant to 18 Pa.C.S.A. § 1102(d).

If Defendant was found guilty of voluntary manslaughter, as a felony of the first degree, he was facing a maximum sentence of twenty years imprisonment, pursuant to 18 Pa.C.S.A. § 1103. If Defendant was found guilty of two counts of involuntary manslaughter, a misdemeanor of the first degree, he was facing a maximum sentence of five years imprisonment on each count, pursuant to 18 Pa.C.S.A. § 1104. If Defendant was found guilty of two counts of aggravated assault, a felony of the first degree, he was facing a maximum sentence of twenty years imprisonment on each count, pursuant to 18 Pa.C.S.A. § 1103. If Defendant was found guilty of two counts of simple assault, a misdemeanor of the second degree, he was facing a maximum sentence of two years imprisonment on each count, pursuant to 18 Pa.C.S.A. § 1104. If Defendant was found guilty of two counts of recklessly endangering another person, a misdemeanor of the second degree, he was facing a maximum sentence of two years imprisonment on each count, pursuant to 18 Pa.C.S.A. § 1104. If Defendant was found guilty of riot, a felony of the third degree, he was facing a maximum sentence of seven years imprisonment, pursuant to 18 Pa.C.S.A. § 1103. If Defendant was found guilty of possessing instruments of crime, a misdemeanor of the first degree, he was facing a maximum sentence of five years imprisonment, pursuant to 18 Pa.C.S.A. § 1104.

Therefore, even if Defendant was found not guilty of the first degree murder charge, if he was found guilty of all the other charges and the imprisonment sentences were to run consecutively, Defendant was facing a maximum of two-hundred and ten

36

years imprisonment. Based on the totality of the circumstances, including the strong evidence against Defendant for these murders, defense counsel's advice to enter the guilty plea was not ineffective and Defendant's PCRA argument to the contrary is without merit.

Defendant's final PCRA argument concerns character witness statements he referenced in his August 26, 2019 Supplemental Reply to Commonwealth's Answer/Motion to Dismiss and attached to his June 21, 2021 pleading. He alleges that without the testimony of the character witnesses, the Court did not have all the evidence it needed to properly sentence Defendant. The Pennsylvania Supreme Court has held that "[t]here are two requirements for relief on an ineffectiveness claim for a failure to present witness testimony. The first requirement is procedural. The PCRA requires that, to be entitled to an evidentiary hearing, a petitioner must include in his PCRA petition 'a signed certification as to each intended witness stating the witness's name, address, date of birth and substance of testimony.'" Commonwealth v. Reid, 99 A.3d 427, 438 (Pa. 2014), citing 42 Pa.C.S.A. § 9545(d)(1) and Pa.R.Crim.P. 902(A)(15). "The second requirement is substantive. Specifically, when raising a claim for the failure to call a potential witness, to obtain relief, a petitioner must establish that: (1) the witness existed; (2) the witness was available; (3) counsel was informed or should have known of the existence of the witness; (4) the witness was prepared to cooperate and would have testified on defendant's behalf; and (5) the absence of such testimony prejudiced him and denied him a fair trial." Reid, 99 A.3d at 438, citing Commonwealth v. Carson, 741 A.2d 686, 707 (Pa. 1999).

Defendant has failed to comply with these requirements. Defendant did not file a

certification or even allege that he told sentencing counsel about the potential character witnesses. Even though there were seven character witness letters attached to the pleading, Defendant supplied a certification from only one of those seven individuals. The certification submitted by Defendant's brother-in-law Gregory Escobar states that after Defendant was convicted, Mr. Escobar went to see current PCRA counsel, Mr. Brown. Mr. Escobar's certification states that, "Mr. Brown requested that I obtain character letters for Mr. Jones and I have contacted many people, who either sent character letters to me or sent them directly to Mr. Brown. I did not advise these persons that they had to testify, but I requested that they provide such character letters. However, if I had been called as a character witness, I would have been ready willing and able to do so and would have freely done so. In fact, if the Court needs me to testify during these proceedings I will testify not only as to his character, but as to my procuring all the character letters for James Jones."

Mr. Escobar's certification is clear that he was in contact with current PCRA counsel and fails to allege that he went to see or contacted Defendant's counsel at the time of conviction and sentencing. The remaining character witness statements do not state that they were prepared to cooperate and would have testified on Defendant's behalf at sentencing. The character statements do not state whether or not they were asked to testify or submit character letters at the time of sentencing. Nor do the character statements state that if they were asked, they would have done so at the time. It has been approximately seven years since Defendant was sentenced and approximately six years since he was resentenced. That is a significant amount of time for potential witnesses to "come around" and now be willing to testify to something that

38

they may not have been willing to testify to in 2013 and 2014, closer to the murders. Defendant has failed to meet his PCRA burden of proof and his issue must be denied.

In conclusion, Defendant's PCRA claim that sentencing counsel was ineffective is found to be wholly without merit and must be dismissed. Since sentencing counsel was deemed effective, appellate counsel could not be found to be ineffective for failing to raise these issues on appeal.

Based on the above Opinion, the following Order is entered:

## ORDER

AND NOW, this **21st** day of December, 2021, upon consideration of Defendant's Petition for Post Conviction Collateral Relief, filed October 19, 2017, the Commonwealth's Answer, filed April 2, 2018, Defendant's Reply to the Commonwealth's Answer/Motion to Dismiss, filed November 8, 2018, Defendant's Supplemental Reply to Commonwealth's Motion to Dismiss, filed August 27, 2019, the Commonwealth's Supplemental Answer to PCRA, filed November 6, 2020, Defendant's Response to the Commonwealth's Answer, filed June 21, 2021, the Commonwealth's Second Supplemental Answer to Defendant's PCRA Petition, filed August 13, 2021, and Defendant's letter response, filed September 9, 2021, it is hereby ORDERED and DECREED as follows:

1. This Court finds that there are no genuine issues concerning any material fact, the claims asserted by Defendant for Post-Conviction Collateral Relief do not have any merit, and no purpose would be served by further proceedings. Defendant is not entitled to post-conviction collateral relief and the PCRA action must be dismissed.

2. Pursuant to Pennsylvania Rule of Criminal Procedure 907, Defendant is

39

hereby advised that after twenty (20) days of this notice, it is this Court's intention to dismiss the PCRA action without further proceedings.

3. If Defendant or his PCRA counsel responds to this notice, said response must be filed and served upon this Court within twenty (20) days of the docketing of this Order. Thereafter, pursuant to Pa.R.Crim.P. 907(1), the Court will either dismiss the action, grant leave to file an amended motion, or direct that a hearing be held. If there is no response, an order will be entered dismissing Defendant's PCRA action.

BY THE COURT:

_____
ANALISA SONDERGAARD, J.

40